UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 5:20-CR-283-DAE-1 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CHRISTOPHER CHARLES PEREZ, | § | |
| | § | |
| Defendant. | § | |

ORDER DENYING MOTION TO DISMISS INDICTMENT

The matter before the Court is Defendant, CHRISTOPHER

CHARLES PEREZ's Motion to Dismiss Indictment filed on May 25, 2021.  (Dkt.

# 64.)  The Government filed a timely response on June 7, 2021.  (Dkt. # 74.)  The

Court held a hearing on the motion on June 8, 2021.

Upon consideration of the parties' arguments raised in the memoranda

and in the motion hearing, the Court **DENIES** the motion for the reasons that

follow.

BACKGROUND

According to the Indictment, on or about April 5, 2020, in the

Western District of Texas, Defendant posted on Facebook the following: "PSA!!

Yo rt HEB MERCADO!! My homeboys cousin has covid19 and has licked every

thing for past 2 days cause we paid him too [4 EMOTICONS] . . . big difference is

1

we told him not to be these fucking idiots who record and post online . . . YOU'VE

BEEN WARNED!!! HEB on nogalitos next ;).''  (Dkt. # 27.)  Defendant also

posted the following on the same day: "Lol…I did try to warn y'all but my

homegirl changed my mind . . . mercado already is, nogalitos location next . . ."

(Id.)  The Government charges Defendant with two counts of false information and

hoaxes, in violation of 18 U.S.C. § 1038(a)(1).  (Id.)  More specifically, the

Indictment charges Defendant with

>  intentionally convey[ing] false and misleading information . . .
>  under circumstances where such information may reasonably
>  have been believed, that indicated that an activity had taken place
>  and would take place, that would constitute a violation of Title
>  18, United States Code, Section 175, the knowing transfer of any
>  biological agent for use as a weapon or threatens to do the same.
>  [All] [i]n violation of Title 18, United States Code, Section
>  1038(a)(1).

(Id.)  A jury trial in this case is set for June 14, 2021.

The matter before the Court is Defendant's motion to dismiss the

indictment.  (Dkt. # 64.)  The Government filed a response on June 7, 2021 (Dkt.

# 74), and the Court held a hearing on the matter on June 8, 2021.  This motion is

ripe for review.

## LEGAL STANDARD

Consideration of a pretrial motion to dismiss is generally proper if a question of law is involved.  See United States v. Fontenot, 665 F.3d 640, 644 (5th Cir. 2011).  Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).

Rule 12(b)(3)(B) is the procedural mechanism for challenging a defect in the indictment prior to trial.  "The test for sufficiency is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimum constitutional standards."  United States v. Kay, 359 F.3d 738, 742 (5th Cir. 2004) (internal quotation omitted).  The indictment must contain (1) "the elements of the offense charged and fairly inform a defendant of the charge against which he must defend," and (2) "enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Id. (internal quotation omitted).  A motion to dismiss an indictment for failure to state an offense requires the Court to take all allegations made in the indictment as true. United States v. Hogue, 132 F.3d 1087, 1089 (5th Cir. 1998).

DISCUSSION

I.      Federalism Challenge

Defendant maintains that he cannot be charged with violating 18 U.S.C. § 1038(a)(1) because principles of federalism prevent the federal government from prosecuting him for the underlying offense, the alleged violation of 18 U.S.C. § 175.  (Dkt.  #64.)  Defendant maintains that his conduct is typically entrusted to local law enforcement, and there is no clear indication that Congress intended for the statute to reach the alleged conduct.  (Id.)  Defendant relies on Bond v. United States, 572 U.S. 844 (2014).  (Id.)

In response, the Government contends that Bond is inapplicable here because it examines a different statute.  (Dkt. # 74.)  The Government also contends that Bond is different because COVID-19, which is extremely contagious, cannot be considered a "purely local" issue.  (Id.)

A.      The Biological Weapons Act

In enacting the Biological Weapons Act, Congress identified two purposes: "(1) [to] implement the Biological Weapons Convention, an international agreement unanimously ratified by the United States Senate in 1974 and signed by more than 100 other nations"; and "(2) [to] protect the United States against the threat of biological terrorism."  United States v. Le, 902 F.3d 104, 109 (2d Cir. 2018) (quoting 18 U.S.C. § 175 note (Declaration of Purpose and Intent)).

"The Convention aims to exclude completely the possibility of biological agents and toxins being used as weapons and, toward that end, requires, *inter alia*, that each State signatory, in accordance with its constitutional processes, implement any necessary measures to prohibit the proliferation of such weapons within its territorial jurisdiction." Id. at 110.

The Biological Weapons Act criminalizes certain conduct in furtherance of its stated statutory purposes. The following language is most pertinent to Defendant's charges:

> Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States.

18 U.S.C. § 175(a). The Act defines a biological "agent" to mean,

> Any microorganism (including, but not limited to, bacteria, viruses, fungi, rickettsiae or protozoa), or infectious substance, or any naturally occurring, bioengineered or synthesized component of any such microorganism or infectious substance, capable of causing—
>
>> (A) death, disease, or other biological malfunction in a human, an animal, a plant, or another living organism;

(B) deterioration of food, water equipment, supplies, or material of any kind; or

(C) deleterious alteration of the environment[.]

Id. § 178(1).  Defendant cannot dispute that COVID-19, a highly contagious and deadly virus, falls within this definition.

The Act defines "for use as a weapon" to "include[ ] the development, production, transfer, acquisition, retention, or possession of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes." 18 U.S.C. § 175(c).  As other courts have noted, this definition presumes that a biological agent is used as a weapon unless it falls within one of the listed permitted uses.  See Le, 902 F.3d at 110.  Defendant does not appear to dispute that licking grocery store items with COVID-19 falls within this definition as well.

B.   Federalism & Bond

The federal government possesses only limited powers; the states and the people retain the remainder.  See Bond, 572 U.S. at 854.  A criminal act committed wholly within a State "cannot be made an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States."  Id. (quoting United States v. Fox, 95 U.S. 670, 672 (1878)).  "'[I]t is incumbent upon the

federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'"  Id. at 858 (quoting Gregory v. Ashcroft, 501 U.S. 452, 460 (1991)).

As the Supreme Court recognized, Bond was an "unusual" and "curious" case.  Carol Anne Bond, the defendant, sought revenge against her close friend, Myrlinda Haynes, after she announced that she was pregnant and it was discovered that Bond's husband was the father.  Id. at 852.  Bond stole a chemical irritant from her employer and spread the chemicals on Haynes's car door, mailbox, and door knob, in the hopes of inducing a rash.  Id.  The chemical irritant caused only a minor thumb burn readily treated by rinsing with water.  Id.  Federal prosecutors charged the defendant with violation of 18 U.S.C. § 229(a), which prohibits the knowing "use [of] . . . any chemical weapon," except for "peaceful purpose[s] related to . . . industrial, agricultural, research, medical, . . . pharmaceutical, . . . or other activity."  Id. at 852–53.  Bond moved to dismiss the chemical weapons counts on the ground that section 229 exceeded Congress's enumerated powers and invaded powers reserved to the states under the Tenth Amendment.  Id. at 853.  She was sentenced to six years in federal prison, and the Third Circuit affirmed.  Id.

The U.S. Supreme Court reversed, holding that there was no indication that Congress intended to reach Bond's purely local conduct pursuant to section 229.  In coming to this conclusion, the Court explained that where a federal statute is being used to prosecute an individual for a crime that is traditionally local in nature, there must be a clear congressional intent to reach such local crimes.  Id. at 859–60.  The Supreme Court identified the natural meaning of "chemical weapon" by referencing the following factors: (1) the type of chemicals and (2) the circumstances in which the defendant used them.  Id. at 860–66.

The Court noted that an "exceptional convergence of factors" compelled its decision.  Id. at 866.  It cautioned that "nothing" in Bond should be read to disrupt federal authority to enforce criminal laws "against assassination, terrorism, [or] acts with the potential to cause mass suffering."  Id. at 864.

Courts that have confronted this federalism argument in 18 U.S.C. § 175 cases utilize the Bond analysis.

1.      Local Crime

The Bond analysis fails at the first step—Defendant is not being charged with what is traditionally a local crime.

Although Defendant's online posts concern a local grocery store, Defendant used the internet, which is routinely recognized as an instrumentality of interstate commerce.  See Le, 902 F.3d at 112; United States v. Barlow, 568 F.3d 215, 220 (5th Cir. 2009) ("[I]t is beyond debate that the Internet and email are facilities or means of interstate commerce."); United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007) ("[T]he Internet is an instrumentality and channel of interstate commerce."); see also United States v. Hornaday, 293 F.3d 1306, 1311 (11th Cir. 2004) (recognizing the federal government's authority to prohibit harmful internet activity even having "primarily intrastate impact").

The Supreme Court has also recognized that the federal government has a substantial interest in enforcing criminal laws in this context.  In Bond, the Supreme Court explained,

> [t]he Federal Government undoubtedly has a substantial interest in enforcing criminal laws against assassination, terrorism, and *acts with the potential to cause mass suffering*.  Those crimes have not traditionally been left predominately to the States, and nothing we have said here will disrupt the Government's authority to prosecute such offenses.

572 U.S. at 864 (emphasis added).  Regulating hoaxes also furthers federal interests in preventing panic-inducing, false reporting.  See, e.g., United States v.

Long, 657 F. App'x 608 (8th Cir. 2016); United States v. Dodd, 579 F. App'x 897, 898 (11th Cir. 2014) ("Sending an anthrax hoax letter is a violation of 18 U.S.C. § 1038(a)(1).").

        Licking food at a grocery store while infected with COVID-19 during a global pandemic has the potential to cause mass suffering, and spreading hoaxes about such acts has the potential to cause mass panic.  Even though Defendant argues that the death rate from COVID-19 is lower than that for other deadly toxins, such as ricin, the chance of death from COVID-19 largely depends on the underlying health conditions of individual people.  Further, unlike other toxins, COVID-19 is extremely contagious—licking food at a grocery store while infected with COVID-19 could cause the virus to spread not just to the shoppers and essential grocery store workers, but also to others who later interact with them. This would include shoppers who travel by air, car, or rail to different parts of the United States.  Thus, Defendant's use of the internet as well as the potential to cause mass harm or panic is not akin to the purely local assault in Bond and presents no need for the Court to further construe 18 U.S.C. § 175 or 18 U.S.C. § 1038(a)(1) according to principles of federalism.

2.   <u>Congressional Intent</u>

In any event, applying federalism principles of construction to the Biological Weapons Act affords Defendant no relief from conviction.  Courts have looked to congressional intent in the meaning of the word "biological toxin" or "biological agent" have followed <u>Bond</u> by analyzing: (1) the type of toxins or agents in the case and (2) the circumstances in which the defendant used them. <u>Le</u>, 902 F.3d at 114.

As stated above, even if the death rate for COVID-19 is lower than that of other toxins, COVID-19 is more contagious than other biological agents or toxins that have been found to be proper applications of 18 U.S.C. § 175.  COVID-19 also causes more harm than the toxin that the defendant used in <u>Bond</u>, which could cause at most a rash on the other person's body and could be mitigated by rinsing it with water.  Giving someone COVID-19 could land the victim in the hospital on a ventilator or cause death.  See <u>United States v. Hale</u>, 762 F.3d 1214, 1225 (10th Cir. 2014) (distinguishing <u>Bond</u> from the defendant's act of mailing a substance purporting to contain a virus because the "[i]nhalation of hantavirus causes the lungs to fill with fluid, leading to severe acute respiratory distress syndrome").  The sheer number of people that could be affected by someone with COVID-19 licking items at a grocery store is also significantly higher than someone sending a deadly toxin to an individual.  The seriousness of the effects of

COVID-19 and the significant number of people that could be and have been affected by the virus lead to the conclusion that this is not a purely local matter. COVID-19 is a biological agent that, under the statute, can be understood as a "biological weapon," and thus, subject to federal law.

With respect to the second factor, the Court must analyze whether licking items at a grocery store would constitute "use as a weapon."  First, Bond does not hold that each of the two factors—type and use—must equally belie a purely local interest.  See Le, 902 F.3d at 114.  Rather, the factors are properly considered together to determine if, on balance, the substance in question is naturally understood as a biological weapon.  Id.  Although Defendant argues that any reasonable person would not find licking grocery store items for the purpose of infecting others to be considered "use as a weapon," the Court is having a difficult time determining any other reason for someone with COVID-19 to lick grocery store items except for to harm or kill others.  See id. at 115 ("Bond does not hold that federalism limits the natural meaning of 'weapon' to a combat instrument. . . . '[W]eapon' is also generally understood to signify an instrument 'designed to be used to injure or kill someone.' (quoting Black's Law Dictionary 1730–31 (9th ed. 2009)).  "Even if federalism principles of construction required the terms 'chemical weapon' and 'biological weapon' to connote a combat instrument, Bond

itself signals that the term 'combat' is not to be construed so narrowly as to exclude 'assassination, terrorism, and acts with the potential to cause mass suffering.'"  Id. at 116 (quoting Bond, 572 U.S. at 864).  As the Second Circuit noted in Le, "such acts are as likely (1) to be carried out by individuals (the proverbial 'lone wolf' or self-radicalized terrorist) as by armies, (2) to target innocent civilians as uniformed combatants, and (3) to be effected clandestinely as in direct encounters."  Id.

There is no federalism issue here as Defendant's conduct does not constitute a purely local crime.  In any event, upon consideration of the type of biological agent at issue, together with the circumstances in which Defendant used the agent, Defendant's threatened conduct falls within the statutory definition of a "biological agent . . . for use as a weapon" as well as a natural meaning of those words.  The Court thus concludes that there are no federalism concerns that preclude application of 18 U.S.C. § 175 or 18 U.S.C. § 1038(a) in this case.

II.   First Amendment

Defendant also argues that 18 U.S.C. § 1038 is (1) facially unconstitutional because it is not "actually necessary" to achieve its stated interests; (2) unconstitutional as applied to Defendant; and (3) facially overbroad

because it prohibits a substantial amount of protected speech relative to its

purported legitimate sweep.  (Dkt. # 64.)  In response, the Government argues that

the First Amendment does not protect hoax threats meant to scare or terrify the

population.  (Dkt. # 74.)

      A.    <u>Facial Challenge</u>

      Generally, "the First Amendment means that government has no

power to restrict expression because of its message, its ideas, its subject matter, or

its content."  <u>Ashcroft v. Am. Civil Liberties Union</u>, 535 U.S. 564, 573 (2002)

(internal quotation marks omitted).  In addition, "content–based regulations [on

speech] are presumptively invalid."  <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382

(1992).  However, content-based restrictions on speech may be permissible when

"confined to the few 'historic and traditional categories [of expression] long

familiar to the bar.'"  <u>U.S. v. Alvarez</u>, 567 U.S. 709, 717 (2012) (quoting

<u>United States v. Stevens</u>, 559 U.S. 460, 468 (2010)).  The relevant category for

purposes of this statute is speech presenting some grave and imminent threat the

government has the power to prevent.

18 U.S.C. § 1038(a)(1) reads:

Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall—

> (A) be fined under this title or imprisoned not more than 5 years, or both;

> (B) if serious bodily injury results, be fined under this title or imprisoned not more than 20 years, or both; and

> (C) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

"The statute requires conduct that conveys false information that, if true, would violate certain enumerated statutes" that would cover a broad range of topics, including: "destruction of aircraft and motor vehicles, biological and chemical weapons, improper use of explosives, improper use of firearms, destruction of shipping vessels, acts of terrorism, sabotage of nuclear facilities, and aircraft piracy." United States v. Onuoha, No. CR 13-00676-BRO, 2014 WL 12633531, at *3 (C.D. Cal. Jan. 31, 2014). Hoaxes of this nature often create responses such as "deployment of first responders, evacuations, hazardous materials units, S.W.A.T. teams, bomb squads, extensive investigations concerning the threat, and

15

more." Id.  Section 1038(a) thus prohibits more than just "false statements"; it prohibits false statements that create serious responses to potential "grave and imminent" threats to the order of society.  See United States v. Keyser, 704 F.3d 631 (9th Cir. 2012) (rejecting a First Amendment challenge to a section 1038(a) hoax-speech conviction where the defendant mailed packets of sugar labeled "anthrax" to businesses and public officials in order to promote a book because terror hoaxes are grave and imminent threats).

Because section 1038(a) prohibits more than just "false statements," it is distinguishable from the Stolen Valor Act, which criminalized making false statements about earning military awards.  In holding that the Act was unconstitutional, the plurality in United States v. Alvarez, 567 U.S. 709 (2012) noted that "[t]he Court has never endorsed the categorical rule . . . that false statements receive no First Amendment protection."  Id. at 719.  In a concurring opinion, Justice Breyer provided examples of false factual statements that would be protected under the First Amendment, including public statements that "may stop a panic or otherwise preserve calm in the face of danger."  Id. at 733.  Section 1038(a) prohibits speech that would cause panic in society, whereas the Stolen Valor Act does not.

Because the hoaxes that are prohibited in 18 U.S.C. § 1038(a) fall under the grave and imminent threat exception, the statute is not facially unconstitutional.

B.   As Applied Challenge

Defendant maintains that the statute is not actually necessary to achieve its stated interest as applied to Defendant's conduct. Defendant states,

> [Defendant] is alleged to have joked on Facebook about paying a friend to lick items at a grocery store. This is likely not the type of conduct that would spark a public panic or merit an overwhelming law enforcement response.

(Dkt. # 64.)

The Court disagrees. COVID-19 has caused death to thousands of people and hospitalized many more. To say that COVID-19 has caused fear in this country would be an understatement of epic proportions. And while many individuals, particularly those with underlying health conditions, stayed at home to avoid exposure to the virus, the grocery store was one of the few places that could not be avoided. Posting online that a friend with COVID-19 licked foods at a particular grocery store would likely spark a public panic and an investigation, as many people would fear for their own health as well as the health of those whom the grocery shoppers interacted with after leaving the store.

The Court is also mystified by Defendant's argument that "the alleged conduct likely had more beneficial than harmful results." (Dkt. # 64.) Defendant attempts to justify this assertion by explaining that his behavior "would likely have encouraged the appropriate level of concern as compared to the downplaying of the seriousness of the pandemic that occurred at the highest levels of Government and permeated through communities around the country." (Id.) However, the Court respectfully disagrees that joking about having exposed innocent people to COVID-19 while purchasing basic biological needs had "more beneficial than harmful results." (See id.)

The speech that is being prohibited in this case had the potential to cause mass panic. Instead of yelling "fire" in a crowded movie theater, Defendant here posted online that his friend with COVID-19 licked foods at a grocery store during a deadly global pandemic. Both actions have the potential to cause mass panic. The actions in this case, however, had the potential to cause even more panic. Yelling "fire" in a crowded movie theater affects everyone inside the movie theater. Posting online that someone with COVID-19 licked foods at the grocery store affects everyone that was in the grocery store over a span of several days and the people that the grocery shoppers interacted with after leaving the grocery store. The speech in this case is of the type that 18 U.S.C. § 1038(a) seeks to prohibit.

Accordingly, the Court finds that § 1038(a) is not unconstitutional as applied to Defendant.

C.   Facially Overbroad

"The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." Ashcroft v. Free Speech Coalition, 535 U.S. 234, 255 (2002). Laws may only be invalidated as overbroad if "a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008) (quoting New York v. Ferber, 458 U.S. 747, 769–71 (1982)).

There are numerous legitimate uses of § 1038(a) that forbid hoaxes concerning: "weapons of mass destruction (18 U.S.C. § 2332A); destruction of aircraft or aircraft facilities (18 U.S.C. § 32); producing or owning biological toxins for use as a weapon (18 U.S.C. § 175); possession of firearms and dangerous weapons in Federal facilities (18 U.S.C. § 930); and distribution of explosives to unlicensed people (28 U.S.C. § 842)." Onuoha, 2014 WL 12633531, at *5. These are just a few examples of many more proper uses.

Defendant's examples of potential violations of § 1038(a) that allegedly lie beyond its stated legislative goals do not outweigh the numerous proper uses of this statute.  Most of Defendant's examples would likely not fall under the statute in any event.  See e.g., United States v. Brahm, 520 F. Supp. 2d 619, 626 (D.N.J. 2007) ("Orson Welles's 'War of the Worlds' broadcast . . . may not qualify as something within the reasonable belief required by the statute."). Further, when comparing valid restrictions on speech to invalid restrictions, courts utilize "a sensitivity to reality" when considering hypothetical situations.  It would appear that the proper uses of the statute, described above, would occur with much more frequency than indictments for parodies and other artistic expressions. Defendant appears to try to place his conduct under the umbrella of a parody by characterizing his behavior as a "joke."  However, the Court notes that this case— where Defendant posted online that a friend with COVID-19 licked food at a grocery store—more closely resembles the classic impermissible behavior of yelling "fire" in a crowded theater.

Because the permissible applications of 18 U.S.C. § 1038(a) significantly outweigh the impermissible applications, the Court finds that the statute is not unconstitutionally overbroad.

<u>CONCLUSION</u>

This case must be analyzed through the lens of time.  At the time of this Order, more and more Americans continue to be vaccinated throughout the United States.  Indoor dining restrictions, mask mandates, and social distancing rules have been lifted or loosened.  The country is returning to a state of normalcy, or to what is often called "the new normal."

Defendant posted his comments online on April 5, 2020—over one year ago.  At that time, the country was in a state of hysteria.  Some people hoarded toilet paper, cleaning products, and hand sanitizer.  Others refused to leave home without gloves, hand wipes, or other protective gear.  While the healthcare system was on the verge of being overrun with COVID-19 patients, Americans in large cities cheered on healthcare workers after their long shifts by clanging pots, pans, and cowbells outside of their windows.  Thousands of people were infected with the virus, many were hospitalized, and many lost their lives.  Americans have not suffered physically, mentally, and emotionally from a such a deadly disease since the 1918 influenza pandemic.

As people calculated the risks of leaving their homes and decided "to do without" many things, the one place that could not be avoided was the grocery store.  People gave up haircuts, appointments, and other social outings, but they could not forgo basic biological needs.  And it was at this time that Defendant

posted online that his friend with COVID-19 licked items at the grocery store. These online posts, when considering the state that country was in at that time, presented a grave and imminent threat not just to the innocent grocery shoppers and essential grocery workers, but to all of the other innocent victims who later interacted with them.

When viewed in hindsight, Defendant's posts in this case are analogous to yelling "fire" in a crowded theatre. But when viewed through the lens of time, the potential implications of Defendant's posts were much more severe.

Accordingly, the Court **DENIES** Defendant's Motion to Dismiss Indictment. (Dkt. # 64.)

**IT IS SO ORDERED.**

**DATED**: June 9, 2021.


_____

David Alan Ezra
Senior United States District Judge

22